## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE AND INFORMATION ASSOCIATED WITH TELEPHONE NUMBER 678-793-8227 | Case No.   2:24-mj-000332-KFW **Filed Under Seal** |
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE AND INFORMATION ASSOCIATED WITH TELEPHONE NUMBER 929-728-4797 | Case No.   2:24-mj-000333-KFW **Filed Under Seal** |
| IN THE MATTER OF THE SEARCH OF THE CELLULAR TELEPHONE AND INFORMATION ASSOCIATED WITH TELEPHONE NUMBER 929-707-8613 | Case No.   2:24-mj-000334-KFW **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Matthew Winn, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of applications for search warrants under Federal Rule of Criminal Procedure 41, and 18 U.S.C. § 2703(c)(1)(A), for information about the prospective location and historic location data for the following cellular telephones:

   a.   The cellular telephone assigned call number 678-793-8227 ("TARGET PHONE NUMBER 1"), whose service provider is T-Mobile, a wireless telephone service provider headquartered at 4 Sylvan Way, Parsippany, NJ 07054.

   b.   The cellular telephone assigned call number 929-707-8613 ("TARGET PHONE NUMBER 2"), whose service provider is AT&T Corporation, a

wireless telephone service provider headquartered at 11760 U.S. Highway 1, North Palm Beach, FL 33408, North Palm Beach, FL.

c.  The cellular telephone assigned call number 929-728-4797 ("TARGET PHONE NUMBER 3"), whose service provider is AT&T Corporation , a wireless telephone service provider headquartered at 11760 U.S. Highway 1, North Palm Beach, FL 33408, North Palm Beach, FL.

2.      As a providers of wireless communications services, T-Mobile and AT&T (collectively "PROVIDERS") are providers of electronic communications services, as defined in 18 U.S.C. § 2510(15).

3.      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," see 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act.  See 18 U.S.C. §§ 3121-3127.  The requested warrant therefore includes all the information required to be included in an order pursuant to that statute.  *See* 18 U.S.C. § 3123(b)(1). A certification by Assistant United States Attorney Sean Green, an attorney for the government, that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by Federal Bureau of Investigation, is included on the signature page of this affidavit.

4.      I am a Special Agent with the Federal Bureau of Investigation and have been since February 2013. During my tenure with the FBI, I received specific training on violent crimes, domestic terrorism, economic crimes, criminal enterprises and other groups who engage in both violent and non-violent crimes. I have participated in large-

scale investigations resulting in the arrest and prosecution of offenders at the federal level. As part of those investigations, I have conducted both physical and electronic surveillance. I have been involved in the execution of various types of search and arrest warrants. I am personally familiar with and have used all normal methods of investigation during my FBI tenure, including, but not limited to, review of cellular service provider location data, visual surveillance, electronic surveillance, informant and witness interviews, and undercover operations. I have participated in the execution of search warrants which resulted in the seizure and review of cellular service provider location data evidence.

5.      This affidavit is intended to show that there is sufficient probable cause for the requested warrants. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.

6.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1030, fraud and related activity in connection with a computer; 18 U.S.C. § 2113(b), bank larceny; and 18 U.S.C. § 371, conspiracy to commit an offense, have been committed, are being committed, and/or will be committed by Karol Tellez, Keyderman Villamizar, Guillermo Rene Tovar-Camacho, Karen Anailith Campo-Paz, and other unidentified subjects. There is also probable cause to believe that the historical location information, as described in Attachment B-2, and that the prospective location information, as described in Attachment B-1, will constitute evidence of these criminal violations, and will lead to evidence of the commission of these offenses. Moreover, the prospective location information described in Attachment B-1 will provide evidence of where the phones are currently located, and there is

probable cause to believe the phones are an instrumentality of the offenses described herein.

## JURISDICTION

7.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## DEFINITIONS AND TECHNICAL TERMS

8.     In my training and experience, I have learned that PROVIDERS are companies that provide cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or "cell tower/sector records." E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest

to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise than E-911 Phase II data.

9.     Based on my training and experience, I know that PROVIDERS can collect cell-site data about the TARGET PHONE NUMBERS. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. This information can be extremely useful when attempting to locate a suspect or identify his or her past historical location. I also know that wireless providers such as PROVIDERS typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes. By analyzing the incoming and outgoing phone numbers along with the duration, date, and time of who the subject (TARGET PHONE NUMBER) is communicating with through the cellular service provider's records can assist law enforcement in identifying the other party to the call. By running those telephone numbers through normal investigative steps and searches through open-source public databases, this can lead to the identification of specific locations such as a hotel, residence, or other type of physical address. When used in conjunction with cell-site and other precision location information can lead to identifying and confirming specific addresses or areas of interest where the subject is or has been. This information is also necessary and part of the service provider's call detail records (ordinary business records) associated with historical cell-site information and

is necessary to gain a more complete understanding and more accurate view of a subject's historical and perspective location.

10.     Based on my training and experience, I know that cellular providers such as PROVIDERS can also collect Timing Advance data, which is also referred to as Per Call Measurement Data ("PCMD"), the "real-time tool" ("RTT"), and True Call data. Timing Advance data estimates the approximate distance of the cellular device from a cellular tower based upon the time it takes for signals to travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

11.     Based on my training and experience, I know that each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), an International Mobile Equipment Identity ("IMEI"), a Subscription Permanent Identifier ("SUPI"), and/or a Network Access Identifier ("NAI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content. Also, once the subject has been taken into custody, this identifying account information (to include email addresses and subscriber information) may also be necessary for evidentiary purposes to identify the cellular records with the subject's phone itself on a particular date and

time. Furthermore, other identifying information such as subscriber information, email addresses associated with the user of the account, all assist law enforcement to identify and confirm the end user (subject) to the account maintained by the service provider. This information may also help identify if the subject discontinues service, changes devices (such as IMEI, ESN, MEID, or SUPI), or if someone else begins using this telephone number after the subject terminates the account or provides the phone to another user.

12.     Based on my training and experience, I know that wireless providers such as PROVIDERS typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as PROVIDERS typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the TARGET PHONE NUMBERS' user or users.

## PROBABLE CAUSE

13.     The United States, including the Federal Bureau of Investigation, is conducting a criminal investigation of Karol Tellez, Keyderman Villamizar, Guillermo Rene Tovar-Camacho, Karen Anailith Campo-Paz, and other unidentified subjects

regarding possible violations of 18 U.S.C. § 1030, fraud and related activity in connection with a computer; 18 U.S.C. § 2113(b), bank larceny; and 18 U.S.C. § 371, conspiracy. The investigation relates to the theft of money from automated teller machines (ATMs) at banks in, among other places, Georgia and Maine.

### The Georgia Thefts

14.     On July 20, 2024, a group of unidentified subjects stole approximately $120,000 from the ATM located at the North Georgia Credit Union located at 249 East Franklin Street, Hartwell, Georgia 30643. The subjects opened the ATM and installed a device inside. They then used a bank card to withdraw approximately $120,000. This technique is commonly referred to as ATM jackpotting. The subjects utilized at least three vehicles: a dark color BMW sedan bearing Georgia tag CCS8912, a white Lexus sedan bearing Georgia tag PVV8027, and at least one additional light color sedan. The license plate number of the Lexus was determined by reviewing bank surveillance footage and license plate readers (LPR) in the area of the credit union. The license plate number of the BMW was determined by reviewing license plate readers in the area of the credit union.

15.     There were two occupants visible in the Lexus. The driver was a Hispanic male (identified through investigation as Guillermo Rene Tovar-Camacho and hereinafter referred to as "TOVAR-CAMACHO")(see Paras. 30, 39-40) and the front seat passenger was a white or Hispanic female (identified through investigation as Karen Anailith Campo-Paz and hereinafter referred to as "CAMPO-PAZ")(see Paras. 30, 39 - 40). TOVAR-CAMACHO wore a blue or similar color collared shirt with a light color fishing-style hat with a large brim and dark sunglasses. CAMPO-PAZ had dark hair and wore a white t-shirt and dark shorts. TOVAR-CAMACHO opened the ATM and

installed a device inside while CAMPO-PAZ appeared to hold a cellular telephone so he could hear the person on the other end of the call. The Lexus and its occupants left and returned to the ATM several times and TOVAR-CAMACHO opened and closed the ATM several times. TOVAR-CAMACHO and CAMPO-PAZ were likely the "Technical Team" responsible for installing the device inside the ATM. The device that TOVAR-CAMACHO installed inside the ATM was a small computer, such as a Raspberry Pi, that was likely used to install malware onto the ATM's computer system. After several visits to the ATM, TOVAR-CAMACHO and CAMPO-PAZ drove off.

16.     At this point in time, the dark color BMW sedan bearing Georgia tag CCS8912 pulled up to the ATM. The driver appeared to be a Hispanic male wearing a dark color hooded sweatshirt with the hood on his head (identified through investigation as Keyderman Villamizar and hereinafter referred to as "VILLAMIZAR")(see Para. 32 - 37). He was also wearing a dark color surgical mask and distinct sunglasses with a gold design on the sides. The front seat passenger appeared to be a white or Hispanic female wearing a white t-shirt (identified through investigation as Karol Tellez and hereinafter referred to as "K. TELLEZ") (See Para. 33 - 34 ) VILLAMIZAR fraudulently withdrew money from the ATM utilizing a bank card and the device installed in the ATM. After completing his transaction(s), he drove off in the BMW.

17.     After the BMW departed, a light color sedan drove up to the ATM. The driver was a white or Hispanic male wearing a dark color fishing hat with a large brim and sunglasses. It appeared his shirt was pulled up over his face to act as a mask. There didn't appear to be any passengers in the vehicle. The male driver fraudulently

withdrew money from the ATM utilizing a bank card and the device installed in the ATM. After completing his transaction(s), the man drove off.

18.     The BMW and light color sedan took turns returning to the ATM and withdrawing money. At one point, the driver in the light color sedan returned to the ATM in a baseball cap and clear lens glasses rather than the fishing hat and sunglasses he had been wearing. He continued to use his shirt to cover his face. After VILLAMIZAR and the driver of the light color sedan finished withdrawing money, the "Technical Team" in the Lexus returned to the ATM. They were likely returning to remove the device they installed inside the ATM. When TOVAR-CAMACHO exited the Lexus, he was wearing the same blue or similar color collared shirt, but he was not wearing the hat or sunglasses he wore earlier. The ATM's camera captured images of his face. Based on a review of the surveillance footage and discussions with the lead investigator from the Hartwell, Georgia Police Department, it appeared TOVAR-CAMACHO was not able to open the ATM and remove the device. After attempting to open the ATM for several minutes, he departed, leaving the device in the ATM.

19.     Officers from the Hartwell Police Department responded to the bank on July 22, 2024, after a bank employee contacted the police to report the theft. A technician from the ATM company explained to the investigator that a device called a Raspberry Pi and a router were installed in the ATM. He said those items did not belong in the ATM. The technician removed the items and gave them to the investigator. The technician and the investigator wore rubber gloves while handling the items. The technician also provided the investigator the ATM's hard drive.

20.     According to the Hartwell Police Department, the subjects first arrived at the credit union at approximately 7:00 p.m. on July 20, 2024, and departed for the last time at approximately 1:30 a.m. on July 21, 2024.

21.     On July 21, 2024, the same group of subjects are believed to have attempted to steal money from the ATM located at the North Georgia Credit Union located at 1067 Mize Road, Toccoa, Georgia 30577.  A bank employee contacted the police on July 22, 2024, and advised that the ATM internal alarm was triggered at 12:42 a.m. on July 22, 2024.  The employee also advised a substance, possibly a petroleum jelly, was smeared on the ATM's security camera.  A review of the credit union's security footage revealed at least two vehicles were involved in the incident.  The vehicles were a dark color BMW and a white Lexus sedan.  The BMW was occupied by two people.  The driver was wearing a dark hooded sweatshirt with the hood on and a dark surgical mask.  The passenger was wearing a dark shirt.  The Lexus appeared to be the same vehicle from the incident in Hartwell the day prior.  LPRs indicated the Lexus used in the Hartwell incident, bearing Georgia tag PVV8027, was also present in the area of the Toccoa incident around the time of the incident.  The driver of the Lexus appeared to be the same Hispanic male, TOVAR-CAMACHO, who drove it during the Hartwell incident.  He had the same build and facial hair and appeared to be wearing the same blue or similar color collared shirt, light color fishing hat, and sunglasses worn in the Hartwell incident.  The passenger in the Lexus, CAMPO-PAZ, appeared to be the same female from the Hartwell incident.  She had the same build, hair color and style, and race.

22.     TOVAR-CAMACHO opened the ATM and appeared to install a device inside.  Simultaneously, CAMPO-PAZ exited the vehicle and smeared a substance on the

lens of the ATM camera as well as a nearby camera.  This substance obstructed the cameras' views.  TOVAR-CAMACHO and CAMPO-PAZ, both in the Lexus, then departed and returned to the ATM several times, with TOVAR-CAMACHO opening and closing the ATM several times.  It appeared he was speaking with someone on his cellular telephone while doing so.  Ultimately, TOVAR-CAMACHO appeared to remove their device from the ATM and depart the area without obtaining any money from the ATM.

23.    According to surveillance footage, the vehicles first arrived at the credit union at approximately 11:40 p.m. on July 21, 2024, and departed for the last time at approximately 1:47 a.m. on July 22, 2024.

### Identification of the Subjects

24.    The FBI conducted LPR analysis which indicated the white Lexus sedan bearing Georgia tag PVV8027 was present in the area of both credit unions around the times of the incidents.  The data also revealed the dark color BMW sedan bearing Georgia tag CCS8912 was present in the area of the credit union branch in Hartwell around the time of the theft.  Motor vehicle registration checks revealed those license plates were not registered to the BMW or Lexus and both license plates were expired.  However, LPR data revealed both license plates had been used on various vehicles they were not registered to.  The LPR data indicated those license plates were scanned by LPR scanners on multiple occasions at the following addresses:

a.       8210 Ainsworth Street, Charlotte, North Carolina

b.       4325 163rd Street, Flushing, New York

25.     The FBI conducted public-source database checks on the two addresses listed above and determined multiple people were associated with both addresses, including:

    a.  Tellez, Karol (AKA: Karolina Tellez, Karol Duarte)

    b.  Livent, Jerry Didiel

    c.  Herrera Tellez, Esteban David

    d.  Herrera Tellez, Valetina

26.     Further analysis indicated Jerry Livent, Esteban Herrera Tellez, and Valentina Herrera Tellez were also associated with the following address:

    a.  323 Winthrow Creek Road, Mooresville, North Carolina

27.     Analysis of this address revealed Keyderman Villamizar, was associated with this address as well as the previously mentioned address of 4325 163rd Street, Flushing, New York.

28.     The FBI reviewed social media profiles that were available for the above listed subjects.  A review of K. TELLEZ's Facebook account revealed a photograph of K. TELLEZ and VILLAMIZAR posing in front of a white Lexus sedan.  The Lexus appeared to be the same model as the Lexus used in the credit union theft and attempted theft.  Additionally, the Lexus in the Facebook photo had damage to the driver-side front bumper/ground effect.  Surveillance footage from the North Georgia Credit Union in Toccoa revealed that the white Lexus used by the jackpotting crew had the same damage to the driver-side front bumper/ground effect.  Based on this information, I believe the white Lexus sedan depicted in K. TELLEZ's Facebook photo is the same white Lexus sedan used in the Hartwell and Toccoa incidents.  A review of VILLAMIZAR's Facebook account revealed a photograph of VILLAMIZAR and K.

TELLEZ together.  In the photo K. TELLEZ was wearing distinct sunglasses with a gold design on the sides.  They appear to be the same model of sunglasses worn by the driver of the dark color BMW used in the Hartwell jackpotting incident.  Furthermore, analysis of K. TELLEZ and VILLAMIZAR's Facebook accounts indicated they are likely in a romantic relationship with each other.

29.    During the course of this investigation, the FBI coordinated with other law enforcements agencies in order to identify subjects.  Photos of the Hispanic male (TOVAR-CAMACHO) who opened the ATMs and installed the devices at the North Georgia Credit Union incidents were shared with the US Secret Service (USSS).  A USSS analyst who tracks ATM jackpotting incidents at the national level reviewed the photos and provided a possible identification of the male as Guillermo Rene Tovar-Camacho. This possible identification was based on the USSS analyst recognizing the Hispanic male (TOVAR-CAMACHO) in the photos sent to her by the FBI.  The analyst was aware of two ATM Jackpotting incidents that occurred in Nebraska, in which TOVAR-CAMACHO was a subject.  The analyst had a picture of TOVAR-CAMACHO's international driver's license that depicted him clearly.  She compared the driver's license photo and the photos sent to her by the FBI and came to the conclusion that they were possibly the same person.

30.    After receiving the possible identification of TOVAR-CAMACHO from the USSS, the FBI reviewed TOVAR-CAMACHO's New York driver's license photo and observed it was consistent with the images of the Hispanic male (TOVAR-CAMACHO) from the surveillance footage.  A search of his name through a law enforcement database revealed a police report from the Scottsbluff, Nebraska Police Department that listed TOVAR-CAMACHO as a subject.  A review of the report indicated two banks in

Nebraska were the victims of ATM Jackpotting on July 4, 2024. One of the vehicles used by the subjects was a gold Honda Accord with Minnesota license plate JBG416. The report noted that TOVAR-CAMACHO was stopped by the Shakopee, Minnesota Police Department on July 2, 2024, when he was an occupant of the above-mentioned gold Honda Accord with Minnesota license plate JBG416. Another occupant of the vehicle when it was stopped was Karen Anailith Campo-Paz.. CAMPO-PAZ is also listed as a subject in the Scottsbluff Police Department report. A review of CAMPO-PAZ's New York driver's license photo is consistent with images of a Hispanic female subject from the surveillance footage of multiple ATM jackpotting incidents in which TOVAR-CAMACHO, K. TELLEZ, and VILLAMIZAR are also subjects. According to US Immigration and Customs Enforcement (ICE) records, CAMPO-PAZ and TOVAR-CAMACHO are married and have two children.

31.    On July 31, 2024, Magistrate Judge Charles Weigle, United States District Court for the Middle District of Georgia, issued a search warrant for timing advance data and traditional tower connection records for the areas around the Hartwell and Toccoa jackpotting incident locations for the time periods of the incidents. The FBI served the warrant and obtained records from the relevant cellular providers. The FBI conducted analysis of the records and determined telephone numbers 347-723-1584, 980-428-2311, 206-608-7926, 206-608-7928, and 917-392-6826 were in the areas of the North Georgia Credit Union in Hartwell, Georgia and the North Georgia Credit Union in Toccoa, Georgia around the time periods of the theft and attempted theft.

32.    The FBI conducted public-source database checks on telephone number 347-723-1584, which indicated the telephone number was attributed to VILLAMIZAR. The FBI also conducted social media checks and determined telephone number 347-

723-1584 was linked to VILLAMIZAR's Instagram page, with the username of "KeydermanVillamizar", and which depicted photos of VILLAMIZAR that matched the photo from his New York driver's license. Based on this information, I believe telephone number 347-723-1584 is utilized by VILLAMIZAR and is hereinafter referred to as "VILLAMIZAR TELEPHONE 1".

33.   On August 25, 2024, the FBI received subscriber information from AT&T, pursuant to a Grand Jury Subpoena, that identified the user of telephone number 980-428-2311 as Karol Tellez and the financial liability party as Juan Tellez, K. TELLZ's son. The FBI conducted public-source database checks on telephone number 980-428-2311, which indicated the telephone number was attributed to K. TELLEZ. Based on this information, I believe telephone number 980-428-2311 is utilized by K. TELLEZ and is hereinafter referred to as K. TELLEZ TELEPHONE.

34.   On August 27, 2024, United States Magistrate Judge Charles Weigle issued a search warrant for historical and prospective cellular data for K. TELLEZ TELEPHONE. The results revealed it was present at more than 17 ATM jackpotting incidents throughout the United States, including in Maine. The data also revealed the phone was routinely located at addresses associated with K. TELLEZ.

35.   On August 27, 2024, United States Magistrate Judge Charles Weigle issued a search warrant for historical and prospective cellular data for VILLAMIZAR TELEPHONE 1. The results revealed it was present at more than nine ATM Jackpotting incidents throughout the United States, including in Maine. The data also revealed the phone was routinely located at addresses associated with VILLAMIZAR. However, as of August 14, 2024, there was no location data for the phone or outgoing call activity.

Based on my training and experience, I believe VILLAMIZAR likely changed the SIM card in the phone or obtained a new phone and phone number.

36.    On August 17, 2024, VILLAMIZAR was arrested by the Rochelle Park, New Jersey Police Department.  A review of the arrest report indicated VILLAMIZAR provided his phone number as 332-269-9517.  On August 24, 2024, VILLAMIZAR was stopped by a police sergeant in Yarmouth, Maine.  The police report indicated that during the stop VILLAMIZAR provided telephone number 332-269-9517 as his telephone number.  Based on this information, I believe telephone number 332-269-9517 is utilized by VILLAMIZAR and is hereinafter referred to as "VILLAMIZAR TELEPHONE 2".

37.    On September 11, 2024, United States Magistrate Judge Charles Weigle issued a search warrant for historical and prospective cellular data for VILLAMIZAR TELEPHONE 2.  The results revealed it was present at more than nine ATM Jackpotting incidents throughout the United States, including in Maine.  The data also revealed the phone was routinely located at addresses associated with VILLAMIZAR.

38.    On September 17, 2024, United States Magistrate Judge Charles Weigle issued a search warrant for historical and prospective cellular data on several telephone numbers including 206-608-7926, 206-608-7928, and 917-392-6826.  The FBI served the warrant and obtained records from T-Mobile.  The FBI conducted analysis of the records and determined telephone number 917-392-6826 was likely attributed to a WIFI Hotspot used by the jackpotting crew.  Furthermore, telephone number 917-392-6826 was in the vicinity of ATM jackpotting incidents, at the approximate time of the incidents, on at least 18 occasions between July 10, 2024, and September 7, 2024.

39.     The FBI analysis indicated telephone numbers 206-608-7926 and 206-608-7928 are on the same account and were activated on the same date.  Both phones are consistently co-located, even when traveling.  Both phones spend the majority of their time in the area of 561 W 180th St Apt 4D, New York, NY 10003, which is an address associated with TOVAR-CAMCHO and CAMPO-PAZ.  Additionally, analysis indicated telephone numbers 206-608-7926 and 206-608-7928 were both in the vicinities of ATM jackpotting incidents, at the approximate time of the incidents, on at least 16 occasions between July 10, 2024, and September 7, 2024.  The FBI reviewed surveillance footage from those incidents and observed a man and a woman believed to be TOVAR-CAMACHO and CAMPO-PAZ at several of them.  This is based on surveillance footage showing the unmasked faces of the man and woman and comparing those images to the New York driver's license photos of TOVAR-CAMACHO and CAMPO-PAZ.

40.     On October 1, 2024, the FBI received subscriber information from Google, pursuant to a Grand Jury Subpoena, that identified several Google accounts linked to the IMEIs used by telephone numbers 206-608-7926 and 206-608-7928.  Those records indicated telephone number 206-608-7926 was linked to Gmail account kcampo960@gmail.com with a subscriber name of Karen Campo.  Based on the above information, I believe telephone number 206-608-7928 is utilized by CAMPO-PAZ and is hereinafter referred to as "CAMPO-PAZ TELEPHONE".  The Google records indicated telephone number 206-608-7926 was linked to Gmail account tavareguillermo@gmail.com with a subscriber name of Guillermo Tavare.  Additionally, checks conducted by the FBI revealed telephone number 206-608-7926 was linked to a Zelle money transfer application account in the name of "Guillermo".  Aeromexico

information revealed TOVAR-CAMACHO listed telephone number 206-608-7926 and

email address tavareguillermo@gmail.com as his contact information when booking

airplane tickets for himself and CAMPO-PAZ on October 15, 2024.  Based on the above

information, I believe telephone number 206-608-7926 is utilized by TOVAR-

CAMACHO and is hereinafter referred to as "TOVAR-CAMACHO TELEPHONE".

### Additional ATM Thefts

41.     After reviewing the records for the telephone numbers outlined in the

paragraphs above and comparing those records with known ATM jackpotting incidents,

the FBI identified 26 ATM jackpotting incidents that were likely perpetrated by at least

one of the four subjects mentioned above (K. TELLEZ, VILLAMIZAR, TOVAR-

CAMACHO, CAMPO-PAZ).  Below is a list of ATM jackpotting incidents that the FBI

has linked to the subjects:

    a.  Adirondack Regional Federal Credit Union, 166 Market Street, Potsdam,
NY

        i.  Date: July 9, 2024

        ii.  Suspects: TOVAR-CAMACHO, CAMPO-PAZ

    b.  Adirondack Regional Federal Credit Union, 672 Route 3, Plattsburgh, NY
12901

        i.  Date: July 10, 2024

        ii.  Suspects: TOVAR-CAMACHO, CAMPO-PAZ

    c.  Adirondack Regional Federal Credit Union, 280 Park St, Tupper Lake, NY
12986

        i.  Date: July 10, 2024

        ii.  Suspects: TOVAR-CAMACHO, CAMPO-PAZ

d. North Georgia Credit Union, 249 East Franklin Street, Hartwell, Georgia 30643

    i. Date: July 20 - 21, 2024

    ii. Suspects: TOVAR-CAMACHO, CAMPO-PAZ, K. TELLEZ, VILLAMIZAR

e. North Georgia Credit Union, 1067 Mize Road, Toccoa, Georgia 30577

    i. Date: July 21 - 22, 2024

    ii. Suspects: TOVAR-CAMACHO, CAMPO-PAZ, K. TELLEZ, VILLAMIZAR

f. Saco & Biddeford Savings, 160 Shops Way, Biddeford, ME 04005

    i. Date: July 27, 2024

    ii. Suspects: TOVAR-CAMACHO, CAMPO-PAZ, K. TELLEZ, VILLAMIZAR

g. Empeople Credit Union, 1298 Alfred Rd, Arundel ME

    i. Date: July 27, 2024

    ii. Suspects: TOVAR-CAMACHO, CAMPO-PAZ, K. TELLEZ, VILLAMIZAR

h. Norstate Federal Credit Union, 306 Main Street, Van Buren, ME 04785

    i. Date: July 28, 2024

    ii. Suspects: TOVAR-CAMACHO, CAMPO-PAZ, K. TELLEZ, VILLAMIZAR

i. Aroostook Savings and Loan, 364 Main Street, Presque Isle, ME

    i. Date: July 29, 2024

    ii.  Suspects: TOVAR-CAMACHO, CAMPO-PAZ, K. TELLEZ, VILLAMIZAR

j.  Educational Systems Federal Credit Union, 15901 Frederick Road, Suite 100, Rockville, MD 20855

    i.  Date: August 4, 2024

    ii.  Suspects: TOVAR-CAMACHO, CAMPO-PAZ, K. TELLEZ, VILLAMIZAR

k.  Educational Systems Federal Credit Union, 13711 Georgia Ave, Silver Spring, MD 20906

    i.  Date: August 4, 2024

    ii.  Suspects: TOVAR-CAMACHO, CAMPO-PAZ, K. TELLEZ, VILLAMIZAR

l.  Educational Systems Federal Credit Union, 7714 Marlboro Pike, Forestville, MD 20747

    i.  Date: August 4, 2024

    ii.  Suspects: TOVAR-CAMACHO, CAMPO-PAZ, K. TELLEZ, VILLAMIZAR

m.  Educational Systems Federal Credit Union, 13711 Georgia Ave, Silver Spring, MD 20906

    i.  Date: August 10, 2024

    ii.  Suspects: K. TELLEZ, VILLAMIZAR

n.  Educational Systems Federal Credit Union, 7714 Marlboro Pike, Forestville, MD 20747

    i.  Date: August 11, 2024

21

      ii.  Suspects: K. TELLEZ, VILLAMIZAR

o.  Educational Systems Federal Credit Union, 13711 Georgia Ave Silver
    Spring MD 20906

      i.  Date: August 12, 2024

      ii.  Suspects: TOVAR-CAMACHO, CAMPO-PAZ, K. TELLEZ,
          VILLAMIZAR

p.  Machias Savings Bank, 3 Glen Street, Rockland, ME 04841

      i.  Date: August 24, 2024

      ii.  Suspects: TOVAR-CAMACHO, CAMPO-PAZ, K. TELLEZ,
          VILLAMIZAR

q.  Five County Credit Union, 710 Main Street, Rockland, ME 04841

      i.  Date: August 24, 2024

      ii.  Suspects: TOVAR-CAMACHO, CAMPO-PAZ, K. TELLEZ,
          VILLAMIZAR

r.  Five County Credit Union, 765 Washington Street, Bath, ME 04530

      i.  Date: August 24, 2024

      ii.  Suspects: TOVAR-CAMACHO, CAMPO-PAZ, K. TELLEZ,
          VILLAMIZAR

s.  Five County Credit Union, 171 Bath Road, Brunswick, ME 04011

      i.  Date: August 24, 2024

      ii.  Suspects: TOVAR-CAMACHO, CAMPO-PAZ, K. TELLEZ,
          VILLAMIZAR

t.  Five County Credit Union, 3 Hamilton Court, Topsham, ME 04086

      i.  Date: August 24, 2024

      ii.  Suspects: TOVAR-CAMACHO, CAMPO-PAZ, K. TELLEZ, VILLAMIZAR

u.  Five County Credit Union, 219 Route 1, Yarmouth, ME 04096

      i.  Date: August 24, 2024

      ii.  Suspects: TOVAR-CAMACHO, CAMPO-PAZ, K. TELLEZ, VILLAMIZAR

v.  Union Bank, 368 VT-15, Jericho, VT 05465

      i.  Date: 9/7/24

      ii.  Suspects: TOVAR-CAMACHO, K. TELLEZ, VILLAMIZAR

w.  Penn East Federal Credit Union, 720 Davis Street Scranton, PA 18505

      i.  Date: 9/13/24

      ii.  Suspects: K. TELLEZ, VILLAMIZAR

x.  Penn East Federal Credit Union, 1070 Northern Blvd. South Abington Township, PA 18411

      i.  Date: 9/14/24

      ii.  Suspects: K. TELLEZ, VILLAMIZAR

y.  Penn East Federal Credit Union, 1070 Northern Blvd. South Abington Township, PA 18411

      i.  Date: 9/15/24

      ii.  Suspects: K. TELLEZ, VILLAMIZAR

z.  TruChoice Federal Credit Union, 6 Barra Rd, Biddeford, ME 04005

      i.  Date: 10/5/24

      ii.  Suspects: K. TELLEZ, VILLAMIZAR

42.     The FBI linked TOVAR-CAMACHO, CAMPO-PAZ, K. TELLEZ, and VILLAMIZAR to the above listed incidents by reviewing phone data that indicated the phones believed to be utilized by the subjects were present in the vicinity of the incidents, at the approximate time of the incidents.  The FBI also reviewed surveillance footage from the incidents and observed the subjects conducting the ATM jackpotting thefts matched the descriptions of TOVAR-CAMACHO, CAMPO-PAZ, K. TELLEZ, and VILLAMIZAR.  In some cases, the subjects did not have masks on, and the FBI was able to compare the surveillance footage to the photos from their New York driver's licenses. The FBI identified similarities in the modus operandi of the group that were seen at the majority of the incidents listed above.  Those included the use of three vehicles, the use of Hyundai sedans, the use of license plates that were not on file, the use of license plates from Connecticut, Pennsylvania, and Georgia, and the technique of smearing a petroleum jelly-like substance on the ATM cameras.  Additionally, the subjects often used the same vehicles they used at previous incidents.  In some cases, this was because they conducted jackpotting thefts at multiple financial institutions in the same night, going from one to the next.  The FBI also reviewed police reports, body worn camera footage, and spoke with officers involved in traffic stops of K. TELLEZ and VILLAMIZAR while they were operating vehicles used in several of the ATM jackpotting incidents.  Some specific examples are outlined in the following paragraphs.

43.     On February 24, 2024, VILLAMIZAR was stopped by a Maryland State Police Trooper for a traffic violation.  VILLAMIZAR was driving a 2015 BMW 528 with Georgia tag CCS8912.  This was the same license plate used during the ATM jackpotting theft at the North Georgia Credit Union in Hartwell, Georgia on July 20, 2024.  Additionally, the make, model, and color of the vehicle was the same as the one

used in the theft. Based on this, I believe it is the BMW used in the Hartwell jackpotting

theft. The BMW's vehicle identification number (VIN) was WBA5A5C51FD516065. An

NCIC search of VIN: WBA5A5C51FD516065 revealed the vehicle was registered to

VILLAMIZAR in Georgia in 2015. The Georgia license plate that was on the BMW when

it was stopped by the trooper (CCS8912) was not registered to the BMW.

     44.    On August 24, 2024, VILLAMIZAR and K. TELLEZ were in the vicinity of

the ATM Jackpotting incident that occurred at the Five County Credit Union located at

219 Route 1, Yarmouth, Maine while it was occurring. They were parked in a vehicle

together, two buildings away from the bank that was targeted. Their vehicle was a blue

Jeep Grand Cherokee with Connecticut license plate AV71105. A Sergeant from the

Yarmouth Police Department had a law enforcement encounter with them due to the

suspicious nature of their presence in the parking lot late at night. The sergeant

identified them with their New York identification cards. It was later determined, by

reviewing surveillance footage, that the vehicle VILLAMIZAR and K. TELLEZ were

driving was one of the vehicles used in the ATM jackpotting incidents at the Five County

Credit Union locations in Yarmouth, Rockland, and Brunswick, Maine as well at the

Machias Savings Bank in Rockland, Maine, that evening and into the next morning.

Additionally, cellular telephone records indicated VILLAMIZAR TELEPHONE 2 and K.

TELLEZ TELEPHONE were present in the vicinity of the credit union at the

approximate time of the ATM jackpotting theft. Based on this, I believe VILLAMIZAR

and K. TELLEZ were involved in the jackpotting theft and were utilizing VILLAMIZAR

TELEPHONE 2 and K. TELLEZ TELEPHONE at the time of the theft.

     45.    On August 17, 2024, VILLAMIZAR was stopped by a police officer in

Rochelle Park, New Jersey while driving a gray, 2007 Honda Odyssey bearing

Pennsylvania tag KBV1356.  This appears to be one of the vehicles used during the July 28, 2024, ATM jackpotting theft at the Norstate Federal Credit Union located at 306 Main Street, Van Buren, Maine.  Surveillance footage from the credit union identified one of the vehicles used as a gray Honda Odyssey bearing Pennsylvania tag KBV1356, which is the same make, model, color, and tag as the vehicle VILLAMIZAR was driving when he was stopped.  The surveillance footage also revealed the driver of the vehicle was a male and that the passenger was wearing a black surgical mask.  The Rochelle Park Police searched the vehicle and located a Georgia license plate that came back as "not on file" when they ran it through the vehicle registration database.  The police also located a small notebook that the officer described as a "ledger", that appeared to indicate who owed VILLAMIZAR money.  Upon opening a storage compartment in the floor of the vehicle, the police located black clothing, a black baseball cap, and two rubber face masks with black wigs attached to them.  They also located a box of black surgical masks in the vehicle.  The subjects involved in the ATM jackpotting incidents often wore black surgical masks during the incidents.  VILLAMIZAR was arrested by the Rochelle Park Police for the charge of "Possessing a False Document".  His vehicle was towed.

46.     On July 28, 2024, an ATM jackpotting theft occurred at the Norstate Federal Credit Union located at 306 Main Street, Van Buren, ME.  The Technical Team drove a gray Hyundai sedan bearing Georgia tag RIU9196, which was captured by the credit union's surveillance cameras.  Prior to opening the ATM and installing the device, the technical team drove up to the ATM in the gray Hyundai, stopped in front of it, and the driver appeared to take photos of the ATM with his cellular telephone.  The driver of the vehicle was not wearing a mask and can be clearly seen when reviewing the footage

from the ATM's camera. The FBI compared the footage of the driver to the New York driver's license photo of TOVAR-CAMACHO, as well as several photos of him from social media, and determined they appear to be the same person. Surveillance footage from the credit union also depicted a large tattoo on the driver's left forearm. The FBI reviewed social media photos of TOVAR-CAMACHO and observed that he has a large tattoo on his left forearm. Additionally, cellular telephone records indicated TOVAR-CAMACHO TELEPHONE was present in the vicinity of the credit union at the approximate time of the ATM jackpotting theft. Based on this, I believe TOVAR-CAMACHO was the driver of the gray Hyundai involved in the jackpotting theft and was utilizing TOVAR-CAMACHO TELEPHONE at the time of the theft.

47.     Additional review of the surveillance footage from the Nortstate Credit Union jackpotting theft revealed the passenger of the gray Hyundai sedan was a Hispanic female with dark hair, wearing blue pants and a white t-shirt with images of skeletons playing musical instruments depicted on the front of it. The FBI obtained surveillance footage from a convenience store located near the credit union. A review of the store's footage revealed a gray Hyundai sedan, believed to be the same Hyundai sedan used in the jackpotting theft, pulled up and parked in front of the store. A Hispanic female with dark hair then exited the front passenger side of the vehicle and entered the store. The woman was wearing blue pants and a white t-shirt with images of skeletons playing musical instruments depicted on the front of it. The woman appeared to be the same woman from the credit union footage. When she entered the store she was not wearing a mask. The FBI compared the footage from the store to the New York driver's license photo of CAMPO-PAZ, as well as several photos of her from social media, and determined they appeared to be the same person. Additionally, cellular

telephone records indicated CAMPO-PAZ TELEPHONE was present in the vicinity of the credit union at the approximate time of the ATM jackpotting theft. Based on this, I believe CAMPO-PAZ was the passenger of the gray Hyundai involved in the jackpotting theft and was utilizing CAMPO-PAZ TELEPHONE at the time of the theft.

### The Target Phones

48.     On September 18, 2024, US Magistrate Judge Karen Wolf, United States District Court for the District of Maine, issued a search warrant for traditional tower connection records for the areas around the ATM jackpotting incident locations listed below for the time periods of the incidents:

     a.  Empeople Credit Union, 1298 Alfred Rd, Arundel, ME, on July 27, 2024

     b.  Norstate Federal Credit Union, 306 Main Street, Van Buren, ME, on July 28, 2024

     c.  Machias Savings Bank, 3 Glen Street, Rockland, ME, on August 24, 2024

     d.  Five County Credit Union, 710 Main Street, Rockland, ME, on August 24, 2024

     e.  Five County Credit Union, 171 Bath Road, Brunswick, ME, on August 24, 2024

     f.  Five County Credit Union, 219 Route 1, Yarmouth, ME, on August 24, 2024

49.     The FBI served the warrant and obtained records from the relevant cellular providers. As described below, an analysis of those records determined that TARGET PHONE NUMBER 1 and TARGET PHONE NUMBER 2 were in the area of ATMs in Maine at the time of jackpotting incidents covered by the warrant.

TARGET PHONE NUMBER 1

50.     TARGET PHONE NUMBER 1 was in the area of the Five County Credit Union in Rockland, ME and the Five County Credit Union in Brunswick, ME around the time periods of the jackpotting incidents.  Analysis of phone records further indicated TARGET PHONE NUMBER 1 has a history of communication with VILLAMIZAR TELEPHONE 1, TOVAR-CAMACHO TELEPHONE, and CAMPO-PAZ TELEPHONE.

51.     The FBI conducted searches on TARGET PHONE NUMBER 1.  Public source database searches revealed the number is attributed to Douglas Ruben Rondon Villarroel.  A search of an insurance claims database revealed the number is attributed to Douglas R. Rondon, with a residential address of 561 W 180th Street, New York, NY, as recently as July 2024.  This is the same address as TOVAR-CAMCHO and CAMPO-PAZ, with the exception that no apartment was listed for Douglas Ruben Rondon Villarroel.  Based on this information, I believe TARGET PHONE NUMBER 1 is used by Douglas Ruben Rondon Villarroel and that he was involved in the ATM jackpotting incidents at the Five County Credit Union in Rockland, ME and the Five County Credit Union in Brunswick, ME on August 24, 2024, while in possession of TARGET PHONE NUMBER 1.

52.     A criminal history check on Douglas Ruben Rondon Villarroel (hereinafter "RONDON VILLARROEL"), indicated he is a Venezuelan citizen and was arrested by US Customs and Border Protection on January 5, 2022, for illegally entering the United States.  A search of the New York driver's database indicated he has a New York driver's license in the name of Douglas Ruben Rondon.

TARGET PHONE NUMBER 2

53.     TARGET PHONE NUMBER 2 was in the area of the Norstate Federal Credit Union in Van Buren, ME; the Machias Savings Bank in Rockland, ME; the Five

County Credit Union in Rockland, ME; the Five County Credit Union in Brunswick, ME; and the Five County Credit Union in Yarmouth, ME; around the time periods of the jackpotting incidents.  Analysis further indicated TARGET PHONE NUMBER 2 has a history of communication with VILLAMIZAR TELEPHONE 1, VILLAMIZAR TELEPHONE 2, and K. TELLEZ TELEPHONE.

54.    The FBI conducted searches on TARGET PHONE NUMBER 2 but was unable to identify anyone associated with the number.  TARGET PHONE NUMBER 2 was linked to a WhatsApp account, but there was no name publicly associated with the account.  I know, based on my training and experience, that criminals often use "burner phones", or phones that are difficult to attribute to them, in the furtherance of their criminal activity.  Based on the lack of results from database searches, I think it is possible the user of TARGET PHONE NUMBER 2 is attempting to obfuscate their connection to the phone, as criminals often do.  I also know from my experience with this investigation, that the subjects involved frequently use WhatsApp to communicate with each other in furtherance of their criminal activity.  The fact that TARGET PHONE NUMBER 2 has a WhatsApp account associated with it is consistent with the modus operandi of the subjects of this investigation.  Furthermore, TARGET PHONE NUMBER 2 has a New York, NY area code.  The subjects of this investigation reside in New York, NY.  Based on this information, I believe TARGET PHONE NUMBER 2 is used by an unknown subject who was involved in the ATM jackpotting incidents at the Norstate Federal Credit Union in Van Buren, ME; the Machias Savings Bank in Rockland, ME; the Five County Credit Union in Rockland, ME, the Five County Credit Union in Brunswick, ME; and the Five County Credit Union in Yarmouth, ME; while in possession of TARGET PHONE NUMBER 2.

TARGET PHONE NUMBER 3

55.     On October 5, 2024, the FBI determined VILLAMIZAR TELEPHONE 2 and K. TELLEZ TELEPHONE were in the city of Biddeford, ME.  This determination was made by reviewing the court authorized geo-location data on those telephones.  The FBI contacted the Biddeford Police Department and advised the supervisor on duty, Sergeant Jacob Wolterbeek, that ATM jackpotting suspects were likely in Biddeford and were likely targeting a financial institution to jackpot.  This assumption was based on the fact that the subjects of this investigation have previously conducted at least six ATM jackpotting operations in Maine, including one in Biddeford.  Additionally, the subjects tended to conduct their jackpotting during the weekend, and October 5 was a Saturday.  The FBI advised Sgt. Wolterbeek that the subjects tended to use Hyundai sedans, as well as vehicles with license plates from Connecticut, Pennsylvania, and Georgia that were expired or not on file, and that the subjects tend to smear petroleum jelly on the ATM cameras and are typically Venezuelan.  The FBI provided up to date geo-location information on VILLAMIZAR TELEPHONE 2 and K. TELLEZ TELEPHONE.

56.     Biddeford Police Officers responded to the area where the phones were located and began looking for suspicious vehicles near financial institutions.  Sgt. Wolterbeek located a blue Hyundai sedan parked in the parking lot of a bank, across the street from the Tru Choice Federal Credit Union (TCFCU) located at 6 Barra Road, Biddeford, ME.  The Hyundai was occupied by a male and a female.  The vehicle remained in the bank parking lot for more than 30 minutes, during which time the bank was closed.  Eventually, the Hyundai departed the area.  A short time later, Sgt. Wolterbeek observed what he believed to be the same vehicle as it was intending to turn into the parking lot of the TCFCU.  However, after the marked police car pulled up

behind the vehicle, it changed course and pulled into the parking lot of a Taco Bell restaurant. Sgt. Wolterbeek noted the license plate on the vehicle was New Jersey tag F99UVM, which came back as expired but previously registered to Ricardo Rangel Lopez (hereinafter "LOPEZ"). After pulling into the Taco Bell parking lot, a male and female exited the vehicle and entered the restaurant. At that time, Sgt. Wolterbeek checked the ATM located at the TCFCU and observed a petroleum jelly-type substance on the camera. Sgt. Wolterbeek recalled seeing a dark blue or black Ford Explorer, driven by a likely Hispanic male wearing a black surgical mask, drive through the ATM lane at TCFCU while he was monitoring the blue Hyundai sedan. At the time he observed the Ford Explorer, one of his officers was able to record the license plate on the vehicle, which was Connecticut tag 895PCD, which came back as not on file. The officer observed the vehicle pull into the parking lot of Amato's.

57.   The Biddeford Police contacted TCFCU and requested someone respond to their Biddeford location due to the discovery of a petroleum jelly-type substance on the ATM and the possibility of an ATM jackpotting theft. A bank representative and Diebold ATM technicians responded to the scene, opened the ATM, and observed a device installed in the ATM that should not have been there. The technicians explained that the device is used to jackpot the ATM. They also located a cellular wifi hotspot on top of the ATM, which did not belong there. The items were collected as evidence. The bank representative showed Sgt. Wolterbeek the surveillance footage, which depicted a dark blue or black Ford Explorer pull up to the ATM. A male exited the vehicle, opened the ATM using what appeared to be a key, and inserted a device inside the ATM. The male then got back into the Ford Explorer and departed the area.

58.     Sgt. Wolterbeek reviewed surveillance footage from the Amato's and observed the male and female occupants from the Ford Explorer bearing Connecticut tag 895PCD enter the shop.  The male appeared to be wearing the same clothing as the male who installed the device inside the ATM.  Sgt. Wolterbeek also reviewed surveillance footage from the Taco Bell and observed the male and female occupants of the blue Hyundai sedan bearing New Jersey tag F99UVM.  The Biddeford Police Department provided the FBI with copies of the footage from both businesses.

59.     I reviewed the footage from Amato's and observed the female from the Ford Explorer appeared to be K. TELLEZ.  This identification was based upon comparing the footage to K. TELLEZ's New York driver's license photo as well as photos from her Facebook account.

60.     The FBI conducted checks on LOPEZ, which revealed he is a Venezuelan citizen who was arrested by United States Customs and Border Protection on October 17, 2023, for illegally entering the United States.  United States Immigration and Customs Enforcement (ICE) provided the FBI a photo taken of LOPEZ at the time of his arrest.  I reviewed the footage from the Taco Bell in Biddeford and observed that the male who was driving the blue Hyundai was consistent with the photo of LOPEZ that ICE provided to the FBI.  The male's build, skin tone, facial hair, and hair color are all consistent.

61.     Throughout the course of this investigation, United States Magistrate Judge Charles Weigle issued multiple court orders for pen register trap/trace devices (PRTT) on WhatsApp accounts associated with K. TELLEZ, VILLAMIZAR, CAMPO-PAZ, TOVAR-CAMACHO, and other unidentified subjects.  I know based on my experience in this investigation as well as conversations with federal investigators

experienced with ATM jackpotting investigations, that jackpotting subjects often hold multi-person WhatsApp calls while they were conducting jackpotting operations. It's my understanding that these calls are used for coordination amongst the subjects involved in the operation. While reviewing WhatsApp call data for the above listed subjects, the FBI identified TARGET PHONE NUMBER 3 as one of the numbers communicating with subjects of this investigation, including participating in the multi-person calls. The FBI conducted database searches on the number. A public source database check revealed the number is attributed to Ricardo R. Lopez, with an address of 318 W 51st Street, Apartment 210, New York, NY. The database indicated TARGET PHONE NUMBER 3 was linked to LOPEZ through banking information.

62.     On September 4, 2024, United States Magistrate Judge Charles Weigle issued a court order for a PRTT on the WhatsApp account linked to TARGET PHONE NUMBER 3. The data revealed the account is most often accessed from IP addresses in New York, NY, where LOPEZ is believed to reside. Based on this information, as well as the public source database linking TARGET PHONE NUMBER 3 to LOPEZ, the fact that a subject matching LOPEZ's description was driving a vehicle with a license plate last registered to LOPEZ, in a city where K. TELLEZ TELEPHONE and VILLAMIZAR TELEPHONE 2 were present, at the time of a jackpotting operation, I believe LOPEZ was involved in the ATM jackpotting operation at TCFCU and was likely utilizing TARGET PHONE NUMBER 3 at the time of the crime and in furtherance of the crime.

63.     Based on my training and experience, I know that criminal groups ("crews"), such as the one that committed these crimes, tend to use cellular telephones to communicate with each other before, during, and after conducting such crimes. Often times members of the crew will serve as lookouts for law enforcement and will

maintain communication with other members of the crew, via cellular telephone, to alert them of law enforcement presence. I also know that members of such crews utilize cellular telephones to conduct research on the locations of their targets, such as street addresses of credit unions. Additionally, they often use the GPS functions on their cellular telephones to provide directions to their target locations.

64.     As outlined in the paragraph above, I know, based on my training and experience, that members of crews often communicate with one another, via cellular telephone, before, during, and after conducting crimes such as stealing from an ATM. I also know that reviewing cellular telephone records aids in the identification of locations used by members of the crew to hide fruits of their crimes. Analysis of these records can also lead to the identification of unknown members of the crew who participated in the crimes. I've also determined, based on phone record analysis and contact with law enforcement officers, that VILLAMIZAR, K. TELLEZ, TOVAR-CAMACHO, and CAMPO-PAZ are very active in ATM jackpotting and likely have been for a long period of time. Therefore, it is reasonable to believe that other members of their crew are also very active in jackpotting. Based on this, I believe obtaining 12 months of records and continuing until 30 days after the issuance of a warrant will aid the FBI in identifying unidentified subjects of this investigation and locations used by the crew to plan their crimes, store tools, clothing, vehicles and other items used in furtherance of the crimes and hide fruits of the crimes. I believe the data will also aid law enforcement in identifying other ATM jackpotting incidents the crew was involved in. This data will also aid law enforcement in locating the subjects in the event warrants are issued for their arrest.

## AUTHORIZATION REQUEST

65.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

66.     The proposed warrant will also function as a pen register order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register and/or trap and trace device to record, decode, and/or capture certain information in Attachment A-1, A-2, and A-3 for each communication to or from the TARGET PHONE NUMBERS, without geographic limit, for a period of thirty (30) days pursuant to 18 U.S.C. § 3123(c)(1).

67.     I further request that the Court direct PROVIDERS to disclose to the government any information described in Section I of Attachment B-1 and B-2 that is within its possession, custody, or control.  I also request that the Court direct PROVIDERS to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information unobtrusively and with a minimum of interference with PROVIDERS' services, including by initiating a signal to determine the location of the TARGET PHONE NUMBERS on PROVIDERS' network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall reasonably compensate PROVIDERS for reasonable expenses incurred in furnishing such facilities or assistance.

68.     Because the warrant will be served on PROVIDERS, who will then compile the requested records at a time convenient to it, good cause exists under Rule 41 to permit the execution of the requested warrant at any time in the day or night.  Further, pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

69.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 90 days after the collection authorized by the warrant has been completed.  There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.  Providing immediate notice to the subscriber or user of the Target Cell Phones would seriously jeopardize the ongoing investigation, as such a disclosure would give that persons an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution.  *See* 18 U.S.C. § 3103a(b)(1).  As further specified in Attachment B-1, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property.  See 18 U.S.C. § 3103a(b)(2).  Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

## CONCLUSION

70.     I submit that this affidavit supports probable cause for warrants to collect the requested information about the location of TARGET PHONE NUMBER 1, as described in Attachments A-1 and A-4; TARGET PHONE NUMBER 2, as described in Attachments A-2 and A-5; and TARGET PHONE NUMBER 3, as described in Attachments A-3 and A-6; and to seize the evidence described in Attachments B-1 and B-2.

Respectfully submitted,

Matthew Winn
Special Agent
Federal Bureau of Investigation

---

**Attorney Certification Under 18 U.S.C. §§ 3121-3127**

To ensure technical compliance with 18 U.S.C. §§ 3121-3127, the warrant applied for herein will also function as a pen register order.  I, Sean Green, an attorney for the Government, certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the Federal Bureau of.  *See* 18 U.S.C§§ 3122(. b), 3123(b).

Sean Green
Assistant United States Attorney

---

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedures

Date:  Oct 28 2024

City and state:  Portland, Maine

*Judge's signature*

Karen Frink Wolf,   U.S. Magistrate Judge
*Printed name and title*